**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA**

**JUDITH CHAIX,**                                     **CIVIL ACTION NO.:**

   **Plaintiff**

**V.**                                                **JUDGE**

**3M COMPANY and**                                    **MAGISTRATE JUDGE**
**ARIZANT HEALTHCARE, INC.,**
                                                      **JURY DEMAND**
   **Defendants**

<u>**COMPLAINT**</u>

Now into Court, through undersigned counsel, comes Plaintiff, Judith Chaix, who files this Complaint with Jury Demand against Defendants 3M Company and Arizant Healthcare, Inc. (hereinafter referred to collectively as "Defendants"), and alleges as follows:

<u>**NATURE OF THE CASE**</u>

1.      This is an action brought on behalf of Judith Chaix for damages arising out of the use of the Bair Hugger forced air warming units or blankets (hereinafter "Bair Hugger").

2.      Defendants, directly or indirectly through their agents, apparent agents, servants, employees are engaged in the business of designing, developing, testing, assembling, manufacturing, packaging, promoting, marketing, distributing, supplying and/or selling Bair Hugger.

3.      Due to the defective design of the Bair Hugger, Plaintiff has suffered and will continue to suffer severe and permanent personal injuries, including, but not limited to, impaired mobility.

4.      In February of 2009, the Bair Hugger was used on Plaintiff during the Plaintiff's hip replacement surgery as well as her hip revision surgery which was also in February of 2009.

1

5.      The Bair Hugger caused contaminates to be introduced into Plaintiff's open surgical wound, which resulted in an infection, and required Plaintiff to undergo additional surgical procedures.

6.      Plaintiff now suffers and will continue to suffer from severe and permanent injuries as a result of the Bair Hugger-induced infection.  Indeed, Plaintiff's mobility is now impaired, making even the simple movement of walking a challenge.

7.      Defendants concealed and continue to conceal their knowledge of the unreasonably dangerous risks of using the Bair Hugger from Plaintiff, other consumers, and the medical community.

8.      Moreover, Defendants failed to conduct sufficient and adequate post-marketing surveillance after they began marketing, advertising, distributing and selling the Bair Hugger.

9.      Because of Defendants' actions and omissions, Plaintiff was injured by the use of the Bair Hugger.  Accordingly, Plaintiff seeks compensatory damages against Defendants.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiff and Defendants.

11.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District, and because Defendants conducted substantial business in this District.

12.     This Court has personal jurisdiction over Defendants because they have done substantial business in the State of Louisiana, have committed a tort in whole or in part in the State

of Louisiana, have substantial and continuing contact with the State of Louisiana, and derive substantial revenue from goods used and consumed in the State of Louisiana.  Defendants actively advertise, sell, market, distribute, and/or promote their Bair Hugger forced air warming devices to physicians and consumers in the State of Louisiana on a regular and consistent basis.

## PARTIES

13.    Plaintiff Judith Chaix (hereinafter "Plaintiff"), is a citizen and resident of the State of Louisiana, and was a citizen and resident of the State of Louisiana at all times relevant to the allegations in this Complaint.   Plaintiff, upon information and belief, suffered severe and permanent personal injuries as a result of the use of Bair Hugger.

14.    Defendant 3M Company is a corporation organized under the laws of the State of Delaware, with a principal place of business in Maplewood, Minnesota.  3M is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly, its products, including the Bair Hugger.

15.    Defendant Arizant is a corporation organized under the laws of the State of Delaware.  Arizant is a wholly owned subsidiary of Defendant 3M.  Arizant conducts throughout the United States, including the State of Louisiana.

16.    Upon information and belief, each of the Defendants was the representative, agent, servant, partner, predecessor or successor in interest, aider and abettor, co-conspirator and joint venture or each of the remaining Defendants, and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

17.    At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into

interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the Bair Hugger forced air warming blanket.

## FACTUAL BACKGROUND

18.     At all times relevant to the allegations herein, Defendants designed, developed, researched, manufactured, tested, advertised, promoted, sold and/or distributed Bair Hugger for the purpose of warming patients during orthopedic implant surgery.

19.     Upon information and belief, there are over 50,000 Bair Hugger units currently in use across the United States.

20.     The Bair Hugger consists of a disposable blanket that is connected to a portable heater/blower by a flexible hose.  The Bair Hugger system is positioned over (or in some cases under) surgical patients during surgery, and keeps patients warm by blowing hot air on the patient's exposed skin.

21.     The hot air accumulates under the surgical blanket and escapes the blanket either below the surgical table or at the head end of the surgical table.  The escaped hot air creates airflow currents that flow against the downward air flow of the operating room.  As this warmed air rises, it deposits bacteria from the floor of the operating room onto the surgical site.

22.     Between 2002 and 2009, Defendants reduced the efficiency of the Bair Hugger air filtration blowers, which drastically reduced the safety of such blowers.

23.     As a result, the internal airflow pathways of the Bair Hugger blowers became contaminated with pathogens.  The pathogens incubate and proliferate within the internal airflow paths of the Bair Hugger blowers.

24. The pathogens are then expelled from the interior of the Bair Hugger blower by the outward airflow, travel through the hose into the disposable blanket and escape into the operating room.

25. Since at least 2009, Defendants have been aware of the pathogenic contamination of the airflow paths of the Bair Hugger.

26. Despite their knowledge to the contrary, Defendants have actively and aggressively marketed the Bair Hugger as safe in both general and orthopedic surgeries.

27. In September of 2009, Defendants falsely represented to the Food and Drug Administration ("FDA") that the Bair Hugger's filtration system meets High Efficiency Particulate Air ("HEPA") standards.  HEPA standards require that an air filter be capable of removing 99.97% of all particles 0.3 microns or larger.  The Bair Hugger filter is marketed as HEPA compliant.  However, the filter is only capable of removing less than 65% of all such particles.  At the time Defendants made these representations, they had actual knowledge that the statements were false.

28. In June of 1997, Defendants admitted that "air blow intraoperatively across the surgical wound may result in airborne contamination."  Defendants further addressed the Bair Hugger's risk of contamination by stating that the risk of contamination is obviated because all "Bair Hugger Blankets designed for use in the operating room feature a tape barrier which prevent [sic] air from migrating toward the surgical site."  Defendants' statement, however, was and is patently false.  In fact, a number of Bair Hugger blankets that are marketed as safe for use in surgeries do not utilize a taped edge.  Instead, those blankets blow contaminated air directly toward the surgical site.

Moreover, Defendants' statement that the taped barrier would prevent the contaminated air from escaping the device is untrue because it ignores the fact that the warm air from the Bair Hugger rises against the general downward airflow of the operating theatre.  The tape barrier does not prevent the Bair Hugger from facilitating the movement of pathogens from the floor of the operating room to the surgical site.  At the time Defendants made these statements, Defendants had actual knowledge of their falsity.

29.     Furthermore, Defendants make the following misrepresentations on their website:

a.  Contamination mobilized by the convention currents generated by the Bair Hugger cannot reach the surgical site because "[a]ir velocity within the operating room is many times stronger than that of a forced air warming blanket";

b.  "The air emerging from the blanket is directed downward by the surgical drape and emerges under the operating room table and is drawn away through the laminar system's return air inlets"; and

c.  "It's been suggested that warm air rising above the Bair Hugger blanket could interfere with the downward laminar flow towards the surgical site.  It should be noted that the Bair Hugger warming unit delivers less than one percent of the airflow of a laminar flow system and the momentum of the downward air is far greater than the upward momentum imparted to the air above the blanket."

30.     Defendants' statements in the preceding paragraphs are false.  Defendants' statements disguise the fact that the true issue with the Bair Hugger is not the strength of the airflow in a laminar system, but instead the hot temperature of the air generated by the Bair Hugger.  The cold air generated by the operating room has a higher density than the hot air generated by the Bair Hugger.  The cold air falls to the floor of the operating room and forces the contaminated air at the floor of the operating room (now warmed by the waste heat from the Bair Hugger) to rise into the

sterile field and surgical site.  Contrary to Defendants' advertisement, the warm air rises and is not

"drawn away" from the surgical site.

31.     In as early as 2010, Defendants advertised the Bair Hugger in multiple medical

publications, available at http://www.fawfacts.com/_asset/zn062p/AJIC.pdf (last visited October

5, 2015), and made the following false and misleading claims:

> "While simple logic makes it clear that forced air warming has no
> impact on laminar conditions, science also supports this.  A forced air
> warming blanket delivers less than one percent of the airflow of a
> laminar flow system and therefore is unable to affect laminar flow
> ventilation systems."

Prior to and after Defendants' statement, Published scientific research has demonstrated the

inaccuracy of this statement.  The Bair Hugger generates an exhaust that creates convective airflow

patterns which disrupt the laminar flow of the operating theatre.

32.     In July of 2012, Defendants' public relations and communications specialist, Greta

Deutsch, stated "some conductive-warming manufacturers have alleged that forced-air warming

increases bacterial contamination of operating rooms or interrupts laminar airflow.

These accusations have no factual basis."  Indeed, this statement ignored numerous published

studies documenting the adverse effects the Bair Hugger has on laminar airflow.

33.     Defendants should have been prompted to redesign or discontinue the Bair Hugger

in light of the numerous peer-reviewed publications and studies identifying the critical defects of

the Bair Hugger.  These publications include, but are not limited to, the following:

> a.  Albrecht M, et al.  Forced-air warming blowers:  An evaluation of
>     filtration adequacy and airborne contamination emissions in the
>     operating room. *Am J Infect Control* 2010;39:321-8;
>
> b.  Leaper D, et al.  Forced-air warming:  a source of airborne
>     contamination in the operating room? *Orthopedic Rev*. 2009;1(2):e28;

    c. McGovern, P.D., et al. Forced-air warming and ultra-clean ventilation do not mix. *J Bone and Joint Surg-Br.* 2012;93-B(11):1537-1544;

    d. Legg, A. et al. Do forced air patient-warming devices disrupt unidirectional downward airflow? *J Bone and Joint Surg-Br.* 2012;94-B:254-6;

    e. Belani, K., et al. Patient warming excess heat: The effects on orthopedic operating room ventilation performance. *Anesthesia & Analgesia* 2012 (prepublication on-line) 2013;117(2):406-411;

    f. Dasari, K.B., et al. Effect of forced air warming on the performance of operating theatre laminar flow ventilation. *Anesthesia* 2012;67:244249.

34.    Defendants were aware that their misrepresentations were false at the time they were made. Nonetheless, Defendants continued to mislead healthcare provides regarding the safety of the Bair Hugger.

35.    Despite the numerous scientific studies to the contrary, Defendants chose not to alter the design of the Bair Hugger or to warn physicians of the dangers associated with the device. Instead, Defendants chose to "double down" on their efforts to market and promote their defective product.

36.    Plaintiff's physician reasonably relied upon Defendants' representations and advertisements to Plaintiff's detriment. Any reasonable physician would not use the Bair Hugger if they were fully aware of the risks associated with it.

37.    As a direct and proximate result of the failure of Defendants' Bair Hugger to maintain the sterility of the surgical site and Defendants' wrongful conduct, Plaintiff has incurred damages, including severe and permanent personal injuries, medical expenses and other economic and non-economic damages.

## CAUSES OF ACTION

### COUNT I:  NEGLIGENCE

38.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

39.     Defendants had a duty to exercise reasonable care when designing, developing, researching, manufacturing, marketing, supplying, promoting, packaging, selling, and distributing Bair Hugger.

40.     Defendants failed to exercise ordinary care in the designing, developing, researching, manufacturing, marketing, supplying, promoting, packaging, selling, and distributing Bair Hugger in that Defendants knew or should have known that using Bair Hugger could cause significant bodily harm, including, but not limited to, physical injuries of a permanent and disabling nature, physical pain and mental anguish, diminished enjoyment of life, hospitalization and other medical expenses, and loss of earnings; and was therefore not safe for consumer use.

41.     Defendants' negligent acts and/or omissions include, but are not limited to:

    a.      Failing to properly and thoroughly test the Bair Hugger before releasing the device to market;

    b.      Failing to properly and thoroughly analyze the data resulting from the pre-market tests of the Bair Hugger;

    c.      Failing to conduct sufficient post-market testing and surveillance of the Bair Hugger;

    d.      Designing, manufacturing, marketing, advertising, distributing, and selling the Bair Hugger to consumers, including Plaintiff, without adequate warning of the significant and dangerous risks of the Bair Hugger and without proper instructions to avoid the harm which could foreseeably occur as a result of the using the device;

    e.      Failing to exercise due care when advertising and promoting the Bair Hugger' and

      f.     Negligently continuing to manufacture, market, advertise, and distribute the Bair Hugger after Defendants knew or should have known of its adverse effects.

42.     Despite the fact that Defendants knew or should have known that Bair Hugger posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the Bair Hugger.

43.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer damages as a result of Defendants' failure to exercise ordinary care as described above.

44.     It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including Plaintiff.

45.     As a direct and foreseeable result of Defendants' negligence, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

46.     Defendants' conduct evidences a flagrant disregard of human life so as to warrant the imposition of punitive damages.  This conduct includes, but is not limited to, the following: failing to adequately design, test, and manufacture the Bair Hugger, and continuing to market and distribute the Bair Hugger when Defendants knew or should have known of the serious health risks it posed to consumers.

47.     As a result of the foregoing negligent actions and/or omissions by Defendants, Plaintiff suffered injuries and damages alleged herein.

## COUNT II:  NEGLIGENT MISREPRESENTATION

48.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

49.     Defendants made negligent misrepresentations regarding the Bair Hugger including, but not limited to, the following:

  a.  Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that Bair Hugger has been tested and found to be safe and effective for the warming of patients during orthopedic implant surgery; and

  b.  Defendants represented that Bair Hugger was safer than other patient warming systems.

50.     Defendants made the foregoing representations without having reasonable grounds for believing them to be true.  The representations made by Defendants were false, in that the Bair Hugger is not safe, fit, and effective for human use.

51.     The foregoing representations were made directly by Defendants, sales representatives, and other authorized agents of Defendants, in publications and other written materials that were directed to Plaintiff, the general public, and healthcare providers, with the intention of inducing reliance on the misrepresentations, thereby promoting the sale and use of the Bair Hugger.

52.     Plaintiff and Plaintiff's physicians did, in fact, reasonably rely upon the representations.  In the absence of the representations, the Bair Hugger would not be used in implantation surgeries such as the one at issue in this case.

53.     As a result of Defendants' actions, omissions, and misrepresentations, Plaintiff suffered severe bodily injuries and damages.

## COUNT III:  FRAUD AND DECEIT

54.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

55.     As a result of Defendants' research or testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including, but not limited to, assuring Plaintiff, healthcare providers, and the FDA, that the Bair Hugger was safe and effective for use as a means to warm patients during orthopedic surgeries.

56.     Defendants intentionally represented that the Bair Hugger has been tested and found to be safe and effective for the warming of patients during orthopedic implant surgery, and that the Bair Hugger was safer than other patient warming systems.

57.     Defendants had a duty to disseminate truthful information to the general public, including Plaintiff, and a parallel duty not to deceive the general public and Plaintiff, as well as the Plaintiff's respective healthcare providers.

58.     The information distributed by Defendants to Plaintiff, the general public, and healthcare providers contained false representations that Bair Hugger was safe and effective for use as a means to warm patients during orthopedic surgeries.

59.     Defendants' representations were all false and misleading.

60.     Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to Defendants, and results demonstrating that the Bair Hugger was not safe as a means of warming patients during orthopedic surgeries.

61.     Defendants' representations were made with the intent that healthcare providers and patients, including Plaintiff, would rely upon them.

62.     Defendants' representations were made with the intent of defrauding and deceiving Plaintiff, other consumers, and healthcare providers to induce and encourage the sale of Bair Hugger.

63.     At the time the representations were made, Plaintiff and/or Plaintiff's respective healthcare providers did not know the truth with regard to the dangerous and serious health and safety concerns associated with the use of the Bair Hugger.

64.     Plaintiff did not discover the true facts with respect to the dangerous and serious health and safety concerns associated with the use of the Bair Hugger, nor Defendants' false representations regarding the same, nor could Plaintiff with reasonable diligence have discovered the true facts.

65.     Plaintiff and Plaintiff's physician did in fact rely upon the representations.  In the absence of Defendants' representations, the Bair Hugger would not be used in implantation surgeries such as the one at issue in this case.

66.     Defendants' conduct was fraudulent and deceitful, and was committed willfully, wantonly and/or purposefully to induce Plaintiff.

67.     As a result of the foregoing acts and omissions, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## COUNT IV:  BREACH OF EXPRESS WARANTY

68.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

69.     Defendants expressly warranted that the Bair Hugger was safe and fit for its intended purposes, that is was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested.  Defendants did not disclose the material risks that the Bair Hugger could cause severe and permanent injury.

70.     Members of the consuming public, including consumers like Plaintiff and his healthcare provider, were intended beneficiaries of the warranty.

71.     Plaintiff and his healthcare provider reasonably relied on Defendants' express representations pertaining to the Bair Hugger's purported safety.

72.     The Bair Hugger did not conform to Defendants' express representations regarding its purported safety because it caused serious injury to Plaintiff when used as recommended and directed, and these risks were not disclosed to Plaintiff or his healthcare provider.

73.     As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## COUNT V:  BREACH OF IMPLIED WARANTY

74.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

75.     When Defendants designed, developed, manufactured, marketed, sold, and/or distributed the Bair Hugger for use by consumers like Plaintiff and Plaintiff's physician, Defendant knew of the use for which the Bair Hugger was intended and impliedly warranted the product to be of merchantable quality and safe for such use.

76.    Plaintiff and his physician reasonable relied upon Defendants' representations regarding the Bair Hugger's merchantable quality and that it was safe for its intended use, and upon Defendants' implied warranty.

77.    Contrary to Defendants' implied warranty, the Bair Hugger was not of merchantable quality or safe for its intended use, because the product was defective, as described herein.

78.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered serious physical injury, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## COUNT VI:  STRICT PRODUCTS LIABILITY

79.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

80.    At all times herein mentioned, Defendants designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the Bair Hugger which was used by Plaintiff.

81.    The Bair Hugger was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was it was produced, manufactured, sold, distributed, and/or marketed by Defendants.

82.    At those times, the Bair Hugger was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiff herein.

83.    The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective in design or

formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable

risks exceeded the benefits associated with the design or formulation of the Bair

Hugger.

84.     The Bair Hugger designed, developed, researched, manufactured, tested,

advertised, promoted, marketed, sold, and/or distributed by Defendants was defective in design or

formulation in that, when it left the hands of the Defendants it was unreasonably dangerous, and it

was more dangerous than an ordinary consumer would expect.

85.     At all times herein mentioned, the Bair Hugger was in a defective condition and

unsafe, and Defendants knew or had reason to know that said product was defective  and unsafe,

especially when used in the form and manner as provided by Defendants.

86.     Defendants knew, or should have known that at all times herein mentioned, their

product was in a defective condition, and was and is inherently dangerous and unsafe.

87.     At the time of Plaintiff's use of the Bair Hugger, the Bair Hugger was being used

for the purposes and in a manner normally intended, namely to warm patients during knee

replacement surgery.

88.     Defendants with this knowledge voluntarily designed its product in a dangerous

condition for use by the public, and in particular Plaintiff.

89.     Defendants had a duty to create a product that was not unreasonably dangerous for

its normal, intended use.

90.     Defendants created a product unreasonably dangerous for its normal, intended

use.

91.     Defendants designed, developed, researched, manufactured, tested, advertised,

promoted, marketed, sold, and/or distributed a defective product which created an unreasonable

risk to the health of consumers and to Plaintiff in particular; and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

92.     Plaintiff could not, by the exercise of reasonable care, have discovered the Bair Hugger's defects herein mentioned and perceived its danger.

93.     The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the product created a risk of serious and dangerous side effects, as well as other severe and personal injuries which are permanent and lasting in nature and Defendants failed to adequately warn of said risk.

94.     The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

95.     The Bair Hugger designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risk of serious and dangerous side effects, including the contamination of the surgical site, as well as other severe and permanent health consequences from the Bair Hugger, they failed to provide adequate warning to users or consumers of the product, and continued to improperly advertise, market, and/or promote the Bair Hugger.

96.     By reason of the foregoing, Defendants have become strictly liable in tort to Plaintiff for the manufacturing, marketing, distribution, and selling of a defective product the Bair Hugger.

97.     Defendants' defective design, manufacturing defect, and inadequate warnings of the Bair Hugger were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

98.     The defects in Defendants' Bair Hugger were a substantial factor in causing Plaintiff's injuries.

99.     As a result of the foregoing acts and omissions, Plaintiff suffered and will continue to suffer serious and permanent injuries, included limited mobility, as well as other severe and personal injuries, physical pain, and mental anguish, diminished enjoyment of life, and expenses for hospitalization.

### COUNT VII:  LOUISIANA PRODUCTS LIABILITY ACT

100.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

101.     At all times relevant to this action, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the Bair Hugger.

102.     At all times relevant to this action, the Bair Hugger was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff herein without substantial change in the condition it was sold.

103.     At all times relevant to this action, the Bair Hugger was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in which ways include, but are not limited to, one or more of the following particulars:

a. When placed in the stream of commerce, the Bair Hugger contained manufacturing defects which rendered the subject product unreasonably dangerous;

b. The Bair Hugger's manufacturing defects occurred while the product was in the possession and control of Defendants;

c. The Bair Hugger was not made in accordance with Defendants' specifications or performance standards; and

d. The Bair Hugger's manufacturing defects existed before it left the control of Defendants.

104.   The subject product manufactured and/or supplied by Defendants was defective in construction or composition in that, when it left the hands of Defendants, it deviated in a material way from Defendants' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula.  In particular, the product is not safe and causes severe and permanent injuries.   The product was unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

105.   The subject product manufactured and/or supplied by Defendants was defective in design in that, an alternative design exists that would prevent severe and permanent injury.  In particular, the development of body warming device without the effects of the Bair Hugger.  The product was unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

106.   The subject product manufactured and/or supplied by Defendants was unreasonably dangerous because Defendants did not provide an adequate warning about the product.  At the time the subject product left Defendants' control, it possessed a characteristic that may cause damage, and Defendants failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.  The product is not safe and causes severe and

permanent injuries.  The product was unreasonably dangerous because of inadequate warning as provided by La. R.S. 9:2800.57.

107.    The subject product manufactured and/or supplied by Defendants was unreasonably dangerous because it did not conform to an express warranty made by Defendants regarding the product's safety and fitness for use.  Defendants' express warranty regarding the subject product induced Plaintiff and Plaintiff's physicians to use the product, and Plaintiff's damage was proximately caused because Defendants' express warranty was untrue.   The product was unreasonably dangerous because of nonconformity to express warranty as provided by La. R.S. 9:2800.58.

108.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## PRAYER FOR RELIEF

Plaintiff respectfully request judgment against Defendants on each of the above counts as follows:

    a.  Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at the trial of this action;

    b.  Economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages, including, but not limited to, all damages sustained as a result of the injury in an amount to be determined at trial of this action;

    c.  Punitive and exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff, in an amount sufficient to punish Defendants and deter future similar conduct;

    d.   Pre-judgment and post-judgment interest as provided by law;

    e.   Plaintiff's attorney fees;

    f.   Plaintiff's costs of the proceedings; and

    g.   Such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all counts and as to all issues and allegations presented herein.

DATED:     December 4, 2015

                    Respectfully submitted,

                      /s/    Michael Hingle
                    Michael Hingle, T.A. #6943
                    Bryan A. Pfleeger, La Bar #23896
                    Julie M. Jochum  La Bar #33463
                    220 Gause Boulevard
                    Slidell, LA 70458
                    Telephone:  (985) 641-6800
                    Fax: (985) 646-1471
                    julie@hinglelaw.com

                    *Counsel for Plaintiff*